**FILED**

**AUG 2 1 2006**

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

UNITED STATES OF AMERICA )
)
v. ) No. 05 CR 70-1
)
BRODERICK JONES, ) Ronald A. Guzman
(a/k/a "Dink" and "Thirsty") )

## PLEA AGREEMENT

This Plea Agreement between the United States Attorney for the Northern District of Illinois, PATRICK J. FITZGERALD, and the defendant, BRODERICK JONES, and his attorneys, JACK RIMLAND and RICHARD HALPRIN, is made pursuant to Rule 11 of the Federal Rules of Criminal Procedure.

This Plea Agreement is entirely voluntary and represents the entire agreement between the United States Attorney and defendant regarding defendant's criminal liability in case 05 CR 70-1.

This Plea Agreement concerns criminal liability only, and nothing herein shall limit or in any way waive or release any administrative or judicial civil claim, demand or cause of action, whatsoever, of the United States or its agencies. Moreover, this Agreement is limited to the United States Attorney's Office for the Northern District of Illinois and cannot bind any other federal, state or local prosecuting, administrative or regulatory authorities except as expressly set forth in this Agreement.

By this Plea Agreement, PATRICK J. FITZGERALD, United States Attorney for the Northern District of Illinois, and the defendant, BRODERICK JONES, and his attorneys, JACK RIMLAND and RICHARD HALPRIN, have agreed upon the following:

1.     Defendant acknowledges that he has been charged in the superseding indictment in this case with one count of conspiring to conduct the affairs of the enterprise, namely, the Chicago Police Department, through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962 (Count One); one count of conspiring to distribute and to possess with intent to distribute controlled substances, namely 5 kilograms or more of mixtures containing cocaine and quantities of marijuana, in violation of 21 U.S.C. § 846 (Count Two); one count of conspiring to commit robbery and extortion affecting commerce, in violation of 21 U.S.C. § 1951) (Count Three); three counts of possession with intent to distribute controlled substances, in violation of 21 U.S.C. § 841(a)(1) (Counts Four, Ten, and Fourteen); two counts of attempting to possess with intent to distribute controlled substances, in violation of 21 U.S.C. § 846 (Counts Seven and Twelve); three counts of committing and attempting to commit robbery and extortion affecting commerce, in violation of 18 U.S.C. § 1951 (Counts Five, Eight, and Fifteen); and five counts of possessing, using, carrying, and brandishing a firearm in furtherance of drug trafficking crimes and crimes of violence, in violation of Title 18, United States Code, Section 924(c) (Counts Six, Nine, Eleven, Thirteen, and Sixteen).

2.     Defendant has read the charges against him contained in the superseding indictment, and those charges have been fully explained to him by his attorney.

3.     Defendant fully understands the nature and elements of the crimes with which he has been charged.

4.     Defendant will enter a voluntary plea of guilty to Counts One, Two, and Sixteen of the superseding indictment in this case.

2

5. Defendant will plead guilty because he is in fact guilty of the charges contained in Counts One, Two, and Sixteen. In pleading guilty, defendant admits the following, which establishes his guilt and relevant sentencing facts beyond a reasonable doubt:[1]

From about 1999 until in or about March 2005, at Chicago and elsewhere, in the Northern District of Illinois, Eastern Division, defendant BRODERICK JONES, being a person employed by and associated with the Chicago Police Department ("CPD"), an enterprise which was engaged in, and the activities of which affected, interstate commerce, conspired with along with Corey Flagg, Darek Haynes, Eural Black, Joseph Wilson, James Walker, Erik Johnson and others to conduct and participate, directly and indirectly, in the conduct of the affairs of the enterprise (the CPD) through a pattern of racketeering activity – which racketeering activity consisted of multiple acts of possession of controlled substances with intent to distribute and distribution of controlled substances (indictable under 21 U.S.C. § 841(a)(1)), attempt and conspiracy to engage in these controlled substance offenses (indictable under 21 U.S.C. § 846), and robbery and extortion (indictable under 18 U.S.C. § 1951 and chargeable under 720 ILCS 5/18-1, 5/8-2, and 5/8-4) all in violation of 18 U.S.C. § 1962(c) and (d). JONES further agreed that a conspirator would commit at least two acts of racketeering in the conduct of the affairs of the enterprise.

In addition, from at least 2003 and continuing until early 2005, in Chicago, in the Northern District of Illinois, Eastern Division, defendant BRODERICK JONES conspired with codefendants Flagg, Haynes, Black, Johnson, Wilson, Walker, Stanley Driver, Jr., Joel Montgomery (a/k/a "Joe

---

[1]The following statement is merely a summary, which is meant to provide a factual basis that will allow the Court to evaluate whether it should accept defendant's guilty plea. This statement is not a full recitation of all relevant facts known by defendant regarding the incidents described below or regarding narcotics trafficking or police corruption more generally.

3

Joc"), and Brent Terry (a/k/a "B"), and with others, knowingly and intentionally to possess with intent to distribute and to distribute controlled substances, namely, 5 kilograms or more of mixtures containing cocaine and quantities of marijuana, in violation of 21 U.S.C. § 846.

Further, on an occasion in the last week of September 2004, in Chicago, in the Northern District of Illinois, Eastern Division, defendant JONES knew that Flagg would and did possess, use, and carry a firearm in furtherance of and during and in relation to a drug-trafficking crime and a crime of violence, for which JONES and Flagg may be prosecuted in a court of the United States, namely, possession with intent to distribute 5 or more kilograms of cocaine and the robbery of these kilograms of cocaine. JONES admits that he and Flagg conspired to commit this drug trafficking crime and crime of violence, that Flagg's possession, use, and carrying of the firearm was in furtherance of that conspiracy, and that it was a foreseeable consequence of that conspiracy that Flagg would possess, use, and carry the firearm, all in violation of 18 U.S.C. § 924(c)(1)(A).

More specifically, JONES, who was an officer with the Chicago Police Department (CPD), agreed with other CPD officers, including Corey Flagg, Darek Haynes, Eural Black, and Erik Johnson, as well as other individuals, including Joseph Wilson, Joel Montgomery, Stanley Driver, Jr., and Brent Terry, to obtain wholesale quantities of cocaine and marijuana, as well as drug money, through robbery, extortion, and other unlawful means. JONES understood that any cocaine and marijuana obtained by the conspirators would be distributed to other individuals in exchange for cash, which cash would be divided among the conspirators participating in each individual ripoff.

JONES agreed with other CPD officers, including Flagg, Haynes, Black, Johnson, and others, to conduct vehicle stops and home invasions of drug dealers in order to illegally obtain drugs, money, and weapons from those drug dealers. JONES received information about the activities of

4

various drug dealers from other individuals, including Wilson, Walker, Driver, Terry, and others, and JONES knew that these other individuals provided him with the information not for legitimate law enforcement purposes, but rather to enable JONES and the other CPD officers to illegally obtain drugs, money, and weapons from drug dealers, which proceeds would be divided among the individuals participating in each individual ripoff.

It was further a part of the racketeering and drug conspiracies that JONES agreed with Flagg, Haynes, Black, Johnson, and other CPD officers to conduct vehicle stops and home invasions of drug dealers, and did conduct such activity, not for legitimate law enforcement purposes, but for the purpose of illegally obtaining drugs, money, and weapons from those drug dealers. In doing so, JONES and the other CPD officers used their power, authority, official position, and knowledge as law enforcement officers to promote and protect the operation of the joint criminal activity. In doing so, JONES and the other CPD officers, and the other individuals, conducted and agreed to conduct the affairs of the CPD – which JONES acknowledges was an enterprise engaged in and whose activities affected interstate commerce – through a pattern of racketeering activity, including multiple acts of robbery, extortion, and drug distribution and possession with intent to distribute.

JONES became a CPD officer in 1997, and at various times, JONES worked in the 7th and 4th CPD Districts. JONES was CPD Officer Eric Johnson's partner on a CPD 7th District gang team for about a year until approximately September 2000, and at various times thereafter JONES was CPD Officer Corey Flagg's partner while working in the 7th and 4th CPD Districts.

In August 2003, JONES was stripped of his police powers and assigned to the "callback unit." Although JONES maintained his employment with the CPD from that time until early 2005, JONES was not authorized to be on the street doing police work or to carry a gun.

5

Both before and after being stripped of his police powers, JONES illegally took drugs and money from drug dealers, and he agreed with other CPD officers to do the same. When drugs were taken during these ripoffs, JONES and the other CPD officers did not inventory the drugs into evidence; instead, JONES distributed and caused others to distribute these drugs to other individuals in exchange for money that could be shared by JONES and his conspirators.

On one occasion in approximately the summer of 2004, JONES, Black, and Johnson illegally took money from a drug dealer. On that occasion, JONES agreed with Johnson and Black to participate in the ripoff of the drug dealer. After Johnson and Black agreed to participate in the ripoff with JONES, the three of them met in a parking lot located at 87th and Lafayette streets in Chicago. JONES arrived at that location in his Cadillac Escalade, and Johnson and Black, who were partners on a 7th CPD District tactical team, arrived in their unmarked CPD police car. At that location, JONES explained the plan to rob the drug dealer, who JONES indicated was a Hispanic individual who thought he would be delivering drugs to an associate of JONES.

After their meeting, the three CPD officers spilt up, with JONES driving his Escalade and Johnson and Black driving their unmarked CPD car, and drove to Indiana Avenue between 91st and 92nd Streets, where they waited for the drug dealer to arrive. After JONES received a telephone call from his associate (the purported drug buyer), JONES told Johnson and Black that the drug dealer was about to arrive, JONES jumped into the unmarked CPD car with Johnson and Black, and the three of them waited for the drug dealer to arrive.

When the drug dealer arrived in the area in an older-model, red, two-door SUV, the three police officers conducted a traffic stop on the red SUV a block or two east on 92nd Street. JONES, Johnson, and Black then exited the unmarked CPD car with guns drawn, they announced that they

6

were police officers, and they ordered the drug dealer out of his SUV. At the time, Johnson and Black, who were on duty, were wearing their ballistic vests, service pistols, and CPD badges hanging around their necks. The drug dealer complied with JONES's and the other officers' orders, and was placed in handcuffs and into the back of the unmarked CPD car. JONES then searched the SUV, recovering a cardboard box containing approximately $24,000.

After arresting the drug dealer and placing him in the back of the police car, Johnson and Black drove the unmarked CPD car a few blocks away, and JONES followed behind driving the SUV. After they stopped a few blocks east of the original stop location, JONES pulled the drug dealer from the unmarked CPD car and spoke with him for a few minutes before letting him go.

After letting the drug dealer leave the area without charging him, Johnson and Black drove JONES back to his Escalade. Later that night, after Johnson and Black went off duty, JONES met Johnson and Black at a gas station on the corner of 71st Street and Martin Luther King Drive. Johnson and Black then entered JONES's Escalade, where JONES handed them a grocery bag containing about $12,000 cash, which was Johnson's and Black's share of the proceeds from the ripoff. Jones kept the remainder of the money.

On another occasion in approximately June 2004, JONES told Flagg to stop the car of a drug dealer, not for legitimate law enforcement purposes, but rather to steal drug money from individuals in that car for JONES's and Flagg's own benefit. On that occasion, JONES and Flagg took approximately $17,000 to $19,000.

On that occasion, JONES was in his Escalade watching activity at the Sunrise Car Wash located at 85th Street and Ashland Avenue in Chicago, which carwash was owned and operated by Joseph Wilson ("Wilson's car wash"). Based upon information JONES received about drug dealers

7

in that area, JONES told Flagg to pull over a particular car, indicating that the car contained at least one gun and a white box containing money, which was drug money connected to a cocaine deal that was supposed to happen at the car wash.

Flagg, who was driving an unmarked CPD car and wearing his gun and CPD badge, pulled over the car, which contained several Hispanic males, in the area of 67th Street and Ashland Avenue in Chicago. Flagg searched the car and found a white box containing a large amount of cash, which Flagg took. After releasing the people in the car, Flagg met JONES behind a Church's chicken on 79th Street near the Dan Ryan Expressway, where Flagg gave JONES the white box containing the cash. Later that day, as instructed by Flagg, JONES entered Flagg's garage using the security code provided by Flagg, and JONES placed Flagg's share of the stolen money, which was a about $8,500, into a 1988 Mustang in Flagg's garage.

On other occasions in the summer of 2004, JONES agreed with Flagg, Haynes, and other officers to follow and pull over suspected drug dealers driving towards or leaving Wilson's car wash so that JONES and the officers could steal drugs and money from those drug dealers.

For example, on July 21, 2004, JONES orchestrated the attempted ripoff of approximately five kilograms of cocaine from individuals who JONES expected to deliver the cocaine to Wilson at Wilson's car wash. On that day, JONES knew that Wilson had ordered about five kilograms of cocaine from an individual whom JONES believed to be one of Wilson's cocaine suppliers. Wilson did not plan to actually purchase the cocaine, however, but rather intended for JONES and other CPD officers to steal the cocaine from drug dealers. JONES then planned for these kilograms of cocaine to be sold, and then for the money from that sale to be split the money with Wilson and any CPD officers participating in the ripoff.

8

JONES first called Flagg and Haynes to participate in the ripoff. JONES, who was supposed to be working in the "callback unit" that day, took part of the day off in order to assist in the ripoff. JONES asked Flagg to pick up Haynes so that the two of them could conduct a traffic stop of the drug dealers and steal the dealers' cocaine. Unbeknownst to JONES and his coconspirators, however, one of the drug dealers they planned to rob was actually a police informant ("CI") who was trying to set up a drug deal between a cocaine supplier and a cocaine buyer (Wilson) as part of an undercover operation.

Among other reasons, JONES enlisted Flagg's help because JONES knew that Flagg had access to a police car, which would allow them to make it look like any stop of the drug dealers' car was the result of legitimate police activity and not a robbery. Flagg and Haynes, neither of whom were on duty on the morning and early afternoon of July 21, agreed to participate in the ripoff with JONES. Although neither Flagg nor Haynes were on duty, their wore their CPD badges and guns in order to make it appear that they were performing legitimate police work.

After Flagg picked up Haynes, they waited for further information from JONES. JONES, in turn, explained to Flagg and Haynes that some Hispanic males were going to Wilson's car wash to deliver multiple kilograms of cocaine, and that the people at the car wash were calling JONES in order to pretend that JONES was the person who was to provide the money for the cocaine transaction and entice the drug dealers to bring the cocaine to that location.

The CI and his drug supplier arrived at Wilson's car wash, but they refused to show the cocaine without seeing the money. After they left the car wash, JONES, who was driving his Escalade, and Flagg and Haynes, who were driving an unmarked CPD car assigned to Flagg, followed the drug dealers along Ashland Avenue after they left the car wash. JONES told Flagg and

9

Haynes that the drug dealers were driving a black Chevy Blazer, and that they should pull over and search the Blazer for the kilograms of cocaine. Along the way, however, JONES, Flagg, and Haynes noticed that a burgundy-colored Chevy Malibu was driving along with the Blazer, which led them to believe that the Malibu was also associated with the drug deal. Flagg and Haynes ultimately pulled over the Malibu, but did not find any drugs or money inside, after which they allowed the driver to leave.

After stopping the Malibu, Flagg noticed another Hispanic male who appeared to be interested in why Flagg stopped the Malibu. Flagg then stopped that person's car as well. The driver of that car identified himself as a CPD officer, after which Flagg let him go. Unbeknownst to Flagg and Haynes, that CPD officer was conducting surveillance in connection with the undercover narcotics investigation of the five-kilogram cocaine transaction involving the CI.

While Flagg and Haynes were pulling over the individual in the Malibu and the CPD surveillance officer, JONES continued to follow the Blazer. JONES also called Flagg and tried to get him to pull over the Blazer. After these events, JONES met up with Flagg at Flagg's house, where the two of them discussed the car stops, including Flagg's stop on the CPD surveillance officer.

After Flagg and Haynes failed to recover any drugs or money in Flagg's and Haynes car stop, JONES met with Wilson, who in turn called the drug dealers to return to the car wash, claiming that the money would soon be there. In reality, JONES and Wilson wanted the drug dealers to return to the area so that JONES could have other corrupt CPD officers to pull over the Blazer and look for the cocaine inside that truck.

JONES turned to CPD Officers Johnson and Black to assist with the ripoff once Flagg and Haynes left the area. Johnson and Black were on duty working together as 7th District tactical officers that day, and thus, they had a CPD car in which they could conduct a traffic stop on the Blazer. After calling Johnson and Black, JONES met with them near 87th Street and Ashland Avenue, where JONES explained to Johnson and Black that he wanted them to stop a truck in order to rob the driver, who was supposed to be transporting kilograms of cocaine.

After receiving the ripoff plan from JONES, Johnson and Black waited for further information from JONES. Once the CI and his drug supplier returned to Wilson's car wash, and again left after Wilson failed to show them any money, JONES contacted Johnson and Black and instructed them to pull over the Blazer, which was being driven by the CI. Johnson and Black pulled the Blazer over near a Jewel Food Store on Ashland, and JONES was nearby in his Escalade. After pulling over the Blazer, Black handcuffed the driver and Johnson searched the truck. At the time, Johnson and Black were wearing their tactical police gear, including their guns, ballistic vests, and CPD badges. During the search, Johnson found no drugs. Johnson and Black later released the driver, and told JONES that they found no drugs.

Later, in August 2004, JONES learned of another ripoff opportunity through Wilson and one of Wilson's associates (codefendant Stanley Driver, Jr.). JONES told Flagg about this ripoff, in which they were to steal about 25 or 30 pounds of "dro," which is hydroponic marijuana. JONES received information from Wilson about the ripoff opportunity over the telephone, and JONES discussed this information with Flagg. JONES, Flagg, Wilson, and Driver also met in person to discuss the robbery plan. The ripoff was to take place, and did take place, on August 16, 2004, in

11

an alley behind a carwash and restaurant located in the 8200 block of South Stoney Island Avenue in Chicago.

Shortly before conducting the ripoff, JONES and Flagg met with Wilson and Driver at a location near the carwash on Stoney Island, where they talked about the ripoff plan. As part of the plan, Driver was to make it appear that he was ordering marijuana for Wilson. JONES and Flagg understood that the people supplying the marijuana would bring a smaller amount of marijuana before the main load arrived, and thus, the plan was for JONES and Flagg to be called to the location when the main load of marijuana arrived so that JONES and Flagg – appearing to act in their capacity as police officers · could stop the car containing the main load of marijuana and steal it.

After this meeting, JONES and Flagg waited in Flagg's unmarked CPD squad car, and after JONES received a call from Driver telling the officers to come to the alley behind the car wash, JONES and Flagg drove to that location. Even though Flagg and Jones were not on duty that day, Flagg was wearing his CPD badge, gun, and bullet-proof vest, and JONES was wearing a bullet-proof vest. When JONES and Flagg arrived, there were several cars and people in the alley. Flagg parked the CPD car in the alley, blocking in the cars. In order to make it look like a legitimate police stop, JONES and Flagg patted down several people in the area, and searched the cars. During this search, Flagg and JONES found a small amount of the marijuana, approximately three to four pounds, in Wilson's car. At one point, Flagg also slapped Driver in the face to make it look like he wasn't involved in the ripoff. Flagg also handcuffed Wilson and put him into the back of the CPD car. JONES and Flagg then let everyone but Wilson leave the area, after which Flagg drove away in the CPD car (which still contained Wilson) and JONES drove away in Wilson's car. JONES and Flagg then met up with each other, they released Wilson and gave him (Wilson) back his car, and

12

JONES re-entered the Flagg's CPD car. JONES later gave Flagg $500, which money came from the sale of the marijuana they had stolen.

In addition to receiving information from Wilson and Driver regarding drug dealers to ripoff, JONES also received information from Walker about potential ripoff targets. Throughout the late summer and fall of 2004, Walker told JONES about various locations where drugs, money, and guns were located. JONES knew that Walker provided him this information so that JONES and his corrupt CPD associates would steal these items and share some of the proceeds with Walker.

For example, in early September 2004, JONES told Flagg about a residence located in the 7900 block of South Langley Avenue in Chicago, which Jones said contained approximately two to five kilograms of cocaine and about $15,000 to $20,000. JONES received the information about this residence from Walker, and he passed the information along to Flagg because he wanted Flagg to steal the cocaine and money at that residence and split the proceeds with Walker and himself.

In order to obtain additional information about this potential ripoff target, JONES ran license plate numbers through a CPD computer in order to learn information about the people who lived at the residence and the cars associated with them. In addition, JONES conducted his own surveillance of the residence.

Also in early September 2004, JONES and Flagg took steps to conduct a drug ripoff at a house located near 26th Street and Troy Avenue in Chicago. During several conversations, JONES received information about this residence from Walker, who told JONES it was a good ripoff target because Walker's associates were trying to set up a drug deal at the location to ensure that drugs should be present. JONES, in turn, passed this information onto Flagg, telling Flagg that the house contained several guns and three kilograms of cocaine, and describing to Flagg the address and

13

layout of the residence. At one point, JONES and Flagg drove through the alley behind the target residence in order to stake out the location.

In early September 2004, JONES and Flagg turned their attention to another ripoff target, a residence located on West 83rd Place in Chicago, where drugs, money, and guns would be located. JONES knew the individual who lived at the residence (referred to herein as "Individual B"), and codefendant Joel Montgomery provided JONES with information about the location. Among other things, JONES believed that Individual B was a large-scale drug dealer because Individual B once flashed a large amount of cash in front of JONES. In addition, Montgomery told JONES where Individual B lived, gave JONES details about Individual B's residence on West 83rd Place, and said that Individual B had three books, meaning three kilograms of cocaine, as well as a large amount of cash, in the tens of thousands of dollars at the residence.

JONES passed this information onto Flagg and Haynes. For example, in a telephone conversation with Flagg, JONES asked Flagg to participate in the ripoff and said that the apartment contained "three books," meaning three kilograms of cocaine, and a "buck," referring to $100,000. When discussing the ripoff opportunity with Haynes, JONES said there were "three of 'em in there for sure," referring to three kilograms of cocaine, and "at least fifty bucks," meaning $50,000. In a later call, JONES reiterated to Hayes that the ripoff opportunity involved "fifty bucks and three of them things."

In addition to calling Flagg and Haynes, JONES also tried to get other police officers to participate in the ripoff. Flagg had court that day, and JONES needed to find a police officer with a police car in order to make the ripoff look like legitimate police activity. In one call, for example, JONES told Haynes that he needed a "car" to "ride up front." However, Flagg's court appearance

14

ended in time for Flagg to be able to meet up with JONES and Haynes and go the building on West 83rd Place to conduct the ripoff.

On September 8, 2004, after receiving information from JONES, Flagg and Haynes went to Individual B's residence located on the second floor of a building on West 83rd Place in order to steal drugs and money which they believed would be found at that address. As with the events on July 21, 2004, Flagg and Haynes were still members of separate CPD teams, Haynes was off duty, and neither of them were authorized to conduct police activity with JONES, who remained in the callback unit.

Before going to Individual B's residence, JONES met with Flagg and Haynes at a nearby park to plan the ripoff. After this meeting, Flagg and Haynes drove over to Individual B's building in Flagg's unmarked CPD squad car, and their plan was to take any drugs or money located inside that residence, and then share the drugs and money with Jones. JONES also traveled to that location in Haynes's Cadillac Escalade, but JONES did not plan to enter the apartment because JONES and Individual B knew each other and JONES did not want Individual B to recognize him if Individual B was at home.

When Flagg and Haynes arrived at Individual B's building, they knocked on the door. At that time, Flagg was wearing his CPD badge and gun, and Haynes was also wearing his bullet-proof vest. A downstairs resident answered the door, and Haynes talked with that person in the doorway. Flagg then went to the upstairs apartment, which was believed to be Individual B's residence. There were a couple of locks on the door, but only one of them was locked. JONES kept telling Flagg over the telephone to kick in the door in order to enter the residence and steal the drugs. At one point, Haynes showed his CPD badge to the downstairs neighbor, who was questioning Flagg and Haynes about

15

their presence at the building. Given their fear that the downstairs neighbor was going to report Flagg's and Haynes's presence at the building to the police, Flagg decided to call his sergeant to the scene.

After Flagg told JONES and Haynes that he needed to call his sergeant to the scene, Haynes left the area. At one point, JONES called Haynes on the telephone and told him to leave the area so that Flagg's sergeant would not know about Haynes's presence at the scene, for which Flagg and Haynes had no legitimate explanation. In particular, JONES, Flagg, and Haynes knew that they were not conducting legitimate law enforcement activity at Individual B's residence, and they knew that Haynes's presence at the scene would not appear to be legitimate to other law enforcement officers given that Haynes was not in his regular police district (the 7th CPD District) and he was not assigned to be working with Flagg. Accordingly, JONES, Flagg, and Haynes needed Haynes to leave the area to conceal their true intent in being at Individual B's residence, which was to steal any drugs and money for their own personal benefit and not for legitimate law enforcement purposes.

Even after Flagg told JONES that he had called his sergeant, and that Flagg might need to get a search warrant for the location, JONES told Flagg to hide drugs and money he recovered from any other law enforcement officers who arrived at Individual B's building. In particular, JONES told Flagg that Flagg might have to show his sergeant one of them "books," meaning one of the kilograms of cocaine, and put the rest in the garbage can so JONES could retrieve them later. In another call, JONES told Haynes that Flagg was going to "boot" the door and "put it," referring to the drugs, "in the garbage can." After these conversations, Haynes left the building on West 83rd Place, and walked down the street where JONES was parked in Haynes's Escalade, entered the truck, and drove away with JONES.

16

After Flagg's sergeant arrived at the 83rd Place address, Flagg left the area to go prepare a search warrant. Flagg's sergeant later called Flagg and told him that Individual B had returned to his residence, and that he had given the officers consent to search it. After Flagg returned, he and members of his Area 2 gun team searched Individual B's apartment and other areas of the building, finding guns and nearly a kilogram of cocaine. After the search was completed and Flagg and members of the Area 2 gun team arrested Individual B, Flagg drove Individual B to the police station. At that time, Individual B mentioned that he knew JONES. With Individual B in Flagg's CPD car, Flagg called JONES and let Individual B talk with JONES to make it seem like JONES had nothing to do with Individual B's arrest.

At some point during Individual B's arrest on September 8, 2004, Individual B's girlfriend came to Individual B's residence. JONES later told Flagg that Individual B's girlfriend was a player, meaning that she was a major narcotics supplier.

At one point, JONES asked Montgomery about Individual B's girlfriend. JONES asked Montgomery if the girlfriend was handling Individual B's drug business while Individual B was locked up or whether the girlfriend could get her hands on some drugs. Montgomery told JONES that he thought Individual B's girlfriend was probably handling Individual B's drug business because she had Individual B's telephones. JONES and Montgomery then discussed robbing drugs and/or money from Individual B's girlfriend.

In different telephone conversations, JONES discussed with Montgomery, Flagg, and co-defendant Brent Terry robbing Individual B's girlfriend while Individual B was locked up. In particular, JONES indicated that Terry was trying to order some kilograms of cocaine from

17

Individual B's girlfriend, which drugs JONES and Flagg would then steal from the girlfriend by making it look like JONES and Flagg were conducting legitimate police activity.

In one call on September 22, 2004, JONES told Montgomery that he wanted "B" (Terry) to order up 20 kilograms of cocaine from Individual B's girlfriend. During the course of the call, Montgomery told JONES told Jones that "B" should ask for a smaller amount of cocaine, such as 5 or 10 kilograms, so that Individual B's girlfriend would not be suspicious of "B's" motives or bring someone else along on the deal. Montgomery offered to help coordinate the transaction. Among other things, Montgomery told JONES that Terry could reach Individual B's girlfriend by calling one of Individual B's telephones.

Within the next several days, Terry was able to set up a ten kilogram cocaine purchase from Individual B's girlfriend, and JONES, Flagg, and Terry set up the ripoff. On the night of the ripoff, which was approximately the last week of September 2004, JONES parked his Escalade at Flagg's house, and the two of them went to the vicinity of 87th Street and the Dan Ryan Expressway in Flagg's unmarked CPD car. At that time and during this entire event, Flagg was wearing his CPD badge and gun. While at that location, JONES talked on the telephone with Terry so that JONES and Flagg would know when Individual B's girlfriend and the kilograms of cocaine arrived in the area.

At one point while JONES and Flagg were sitting in Flagg's CPD car, JONES received a telephone call, which was a call from Terry, who was pretending to call the person (JONES) to bring the money to the drug transaction. In reality, this call was a signal for JONES and Flagg to come to the area where the drug deal was happening so that JONES and Flagg could steal the drugs. As planned, JONES and Flagg then went by Burger King on 87th Street near Michigan Avenue, where they saw Individual B's girlfriend in an older, greenish-colored Nissan, along with Terry. Flagg then

18

pulled Individual B's girlfriend out of the car, handcuffed her, and placed her in the back of his CPD car. JONES pulled Terry out of the car, and also placed him in the back of the CPD car. Flagg then drove his squad car away from the Burger King, and parked in an alley a short distance away. JONES, who drove the Nissan, followed Flagg into the alley. In the alley, Individual B's girlfriend said that all of the cocaine in her car belonged to Terry. JONES retrieved a black duffel bag containing cocaine from the Nissan, and placed it in the trunk of Flagg's squad car. Flagg then released Individual B's girlfriend, after which she got into her car and left the area. Flagg and JONES then uncuffed Terry, and the three of them drove to Flagg's house.

At Flagg's house, JONES took the black duffel bag from the CPD car and opened it, displaying the ~~ten kilograms~~ _B.3 multiple kilograms B.3_ of cocaine they had stolen. JONES and Terry then left Flagg's house in JONES's Escalade, taking with them the bag containing the kilos of cocaine. Terry subsequently sold the ~~ten~~ _multiple B.3_ kilograms of cocaine, and split the money with JONES. JONES shared some of this money with Flagg, giving him about $24,000 to $26,000.

In addition to the ripoffs and attempted ripoffs they conducted in 2004, JONES, Flagg, and others conducted ripoffs of other drug dealers on prior occasions. In particular, JONES and Flagg knew an individual nicknamed "Corky," who provided them with information that they used to rob other drug dealers. JONES understood that Corky was involved in robbing drug dealers, and the information that Corky provided to JONES was for individuals that Corky wanted to rob but could not do so for some reason.

Corky provided JONES with information that led to at least two search warrants, one of which occurred on North Sheridan Road in Chicago at a time when JONES and Flagg were assigned to the 7th CPD District gang team. During the execution of that search warrant, Flagg recovered approximately $17,000 from a kitchen drawer, which money Flagg did not inventory, but rather split

19

with JONES. Heroin was also recovered during the execution of that search warrant, which heroin was inventoried in connection with the arrest of a Nigerian individual living at the residence that was searched. In addition, JONES paid Corky money for his assistance in the ripoff, which money was taken from the wallet of the person they arrested.

Corky provided JONES with information for another search warrant that occurred on 104th Street in Chicago. At this time, JONES and Flagg were no longer on a gang team, but a gang team did support their search. One-half kilogram of cocaine and $2,000 were recovered during the execution of this search warrant. JONES gave some of the $2,000 to Flagg, which Flagg kept for his own benefit.

In addition, in approximately the summer of 2002, JONES participated in the ripoff of a drug dealer with Flagg and Officer F. On that occasion, JONES received information from an individual regarding a person who would be traveling by car to purchase approximately one kilogram of cocaine. JONES, Flagg, and Officer F, who were in an unmarked CPD squad car, stopped a vehicle containing two men and one woman on Ashland Avenue near 62nd Street in Chicago. After making the stop, Flagg opened the trunk of the vehicle and found a large amount of money in the trunk. JONES recovered some money from the passenger compartment of the vehicle, as well as the money that Flagg found in the trunk, which money totaled approximately $20,000. The occupants of the vehicle were subsequently released, and JONES, Flagg, and Officer F went to the alley behind Flagg's house and split the money. JONES, Flagg, and Officer F each received about $5,000, with the remaining $5,000 going to the individual who provided JONES with the information leading to the ripoff.

6. For purposes of applying the guidelines promulgated by the United States Sentencing Commission pursuant to Title 28, United States Code, Section 994, the parties agree and disagree on the following points:

(a) The 2005 version of the Sentencing Guidelines applies.

(b) <u>Count Two - Drug Conspiracy</u>

(1) Pursuant to USSG §§1B1.3, 2D1.1(a)(3), and 2D1.1(c)(3), the base offense level is level 34 because the amount of drugs involved in the offense of conviction and relevant conduct, including the amounts of cocaine (approximately 23 kilograms) and marijuana (approximately 3-4 pounds) discussed above, is the equivalent of between 3,000 and 10,000 kilograms of marijuana.

(2) The offense level *is not* be increased by 2 levels pursuant to USSG § 2D1.1(b)(1), because the presence of dangerous weapons (firearms) is accounted for with the conviction on Count Sixteen, which is a § 924(c) count;

(3) Pursuant to USSG § 3A1.3, the offense level should be increased by 2 levels because a victim was physically restrained during the course of the offense.

(4) Pursuant to USSG § 3B1.1(a), the offense level is increased by 4 levels because defendant was an organizer and leader of criminal activity that involved five or more participants;

(5) Pursuant to USSG § 3B1.3, the offense level should be increased by 2 levels because defendant abused a position of public trust in a manner that significantly facilitated the commission of the offense.

21

(6)     Pursuant to USSG § 3B1.5, the offense level should be increased by 2 levels because the offense involved the use of body armor during the commission of a drug trafficking offense.

(7)     Pursuant to USSG § 3C1.1, the offense level is increased 2 levels, because defendant willfully attempted to obstruct or impede the administration of justice during the course of the investigation and prosecution of the offense. Defendant reserves the right to disagree with this enhancement.

(8)     Based on the above, the government submits that the adjusted offense level is 46.

    (c)    Count One - RICO Conspiracy

(1)     Pursuant to USSG § 2E1.1, the base offense level for the RICO conspiracy count is 19, or the offense level applicable to the underlying racketeering activity, whichever is greater.

(2)     Pursuant to USSG § 2E1.1, comment (n.1), each underlying offense comprising the underlying racketeering activity is treated as a separate count of conviction. As set forth in more detail below, the narcotics-related racketeering activity is grouped together in one group pursuant to USSG § 3D1.2, and each individual robbery is counted as a separate group pursuant to USSG § 3D1.2 and § 3D1.2 comment (n.6).

(3)     Narcotics-Related Racketeering Activity: Because each of these underlying offenses involves possessing controlled substances with intent to distribute or distributing controlled substances, or conspiring or attempting to do so, these underlying offenses are grouped together into a single group for sentencing purposes pursuant to USSG § 3D1.2 (b) and (d). The government submits that the offense level for defendant's underlying narcotics-related racketeering

22

activity is the same as the offense level for Count Two, which is level 46 as set forth above in subsection 6(a). Defendant reserves the right to make the same objections to these guideline calculations as they relate to Count One.

        (4)    <u>Robbery-Related Racketeering Activity</u>: Pursuant to USSG § 3D1.2 and § 3D1.2 comment (n.6), each robbery is considered a separate group. The government submits that the following preliminary calculations should apply for the following robberies, and the defense reserves the right to object to these calculations:

        (A)    <u>Summer 2004 Robbery of $24,000 (Federal Robbery)</u>

           (i)    Pursuant to USSG § 2B3.1(a), the base offense level is 20.

           (ii)    Pursuant to USSG § 2B3.1(b)(2)(A), the offense level is increased by 5 levels because a firearm was brandished or possessed.

           (iii)    Pursuant to USSG § 2B3.1(b)(4)(B), the offense level is increased by 2 levels because a person was physically restrained to facilitate the commission of the offense.

           (iv)    Pursuant to USSG § 2B3.1(b)(6), the offense level is increased by 1 because the taking of a controlled substance was an object of the offense.

           (v)    Pursuant to USSG § 2B3.1(b)(7)(B), the offense level is increased by 1 level because the intended loss was more than $10,000 but not more than $50,000.

           (vi)    The offense level *should not* be increased by 2 levels pursuant to USSG § 3A1.3, because this enhancement is accounted for under USSG § 2B3.1(b)(4)(B).

           (vii)    Pursuant to USSG § 3B1.1(c), the offense level is increased by 2 levels because defendant was an organizer and leader of criminal activity;

23

(viii) Pursuant to USSG § 3B1.3, the offense level should be increased by 2 levels because defendant abused a position of public trust in a manner that significantly facilitated the commission of the offense.

(ix) Pursuant to USSG § 3B1.5, the offense level should be increased by 2 levels because the offense involved the use of body armor during the commission of a crime of violence.

(x) Pursuant to USSG § 3C1.1, the offense level is increased 2 levels, because defendant willfully attempted to obstruct or impede the administration of justice during the course of the investigation and prosecution of the offense. Defendant reserves the right to disagree with this enhancement.

(xi) The government submits that based on the above calculations, the adjusted offense level is 37.

(B) Summer 2004 Robbery of $17,000 from A Cocaine Dealer (Federal Robbery)

(i) Pursuant to USSG § 2B3.1(a), the base offense level is 20.

(ii) Pursuant to USSG § 2B3.1(b)(2)(A), the offense level is increased by 5 levels because a firearm was brandished or possessed.

(iii) Pursuant to USSG § 2B3.1(7)(B), the offense level is increased by 1 level because the intended loss was more than $10,000 but not more than $50,000.

(iv) Pursuant to USSG § 3B1.1(c), the offense level is increased by 2 levels because defendant was an organizer and leader of the criminal activity;

(v) Pursuant to USSG § 3B1.3, the offense level should be increased by 2 levels because defendant abused a position of public trust in a manner that significantly facilitated the commission of the offense.

(vi) Pursuant to USSG § 3B1.5, the offense level should be increased by 2 levels because the offense involved

24

the use of body armor during the commission of a crime of violence.

(vii) Pursuant to USSG § 3C1.1, the offense level is increased 2 levels, because defendant willfully attempted to obstruct or impede the administration of justice during the course of the investigation and prosecution of the offense.

(viii) The government submits that based on the above calculations, the adjusted offense level is 34.

(C) July 21, 2004 Attempted Robbery of Five Kilograms of Cocaine (Federal Robbery)

(i) Pursuant to USSG § 2B3.1(a), the base offense level is 20.

(ii) Pursuant to USSG § 2B3.1(b)(2)(A), the offense level is increased by 5 levels because a firearm was brandished or possessed.

(iii) Pursuant to USSG § 2B3.1(b)(4)(B), the offense level is increased by 2 levels because a person was physically restrained to facilitate the commission of the offense.

(iv) Pursuant to USSG § 2B3.1(b)(6), the offense level is increased by 1 because a controlled substance was taken.

(v) The offense level *should not* be increased by 2 levels pursuant to USSG § 3A1.3, because this enhancement is accounted for under USSG § 2B3.1(b)(4)(B).

(vi) Pursuant to USSG § 3B1.1(a), the offense level is increased by 4 levels because defendant was an organizer and leader of criminal activity that involved five or more participants;

(vii) Pursuant to USSG § 3B1.3, the offense level should be increased by 2 levels because defendant abused a position of public trust in a manner that significantly facilitated the commission of the offense.

25

(viii) Pursuant to USSG § 3B1.5, the offense level should be increased by 2 levels because the offense involved the use of body armor during the commission of a crime of violence.

(ix) Pursuant to USSG § 3C1.1, the offense level is increased 2 levels, because defendant willfully attempted to obstruct or impede the administration of justice during the course of the investigation and prosecution of the offense.

(x) The government submits that based on the above calculations, the adjusted offense level is 38.

(D) August 16, 2004 Robbery of Marijuana (State Robbery)

(i) Pursuant to § 1B1.2, comment (n.1), for statutory provisions not listed in the statutory index, the most analogous guideline is determined pursuant to § 2X5.1 (Other Offenses). The state robbery is most analogous to federal robbery, USSG § 2B3.1, which calls for a base offense level of 20.

(ii) Pursuant to USSG § 2B3.1(b)(2)(A), the offense level is increased by 5 levels because a firearm was brandished or possessed.

(iii) Pursuant to USSG § 2B3.1(b)(6), the offense level is increased by 1 because the taking of a controlled substance was the object of the offense.

(v) Pursuant to USSG § 3B1.1(c), the offense level is increased by 2 levels because defendant was an organizer and leader of the criminal activity;

(vi) Pursuant to USSG § 3B1.3, the offense level should be increased by 2 levels because defendant abused a position of public trust in a manner that significantly facilitated the commission of the offense.

(vii) Pursuant to USSG § 3B1.5, the offense level should be increased by 2 levels because the offense involved the use of body armor during the commission of a crime of violence.

(viii) Pursuant to USSG § 3C1.1, the offense level is increased 2 levels, because defendant willfully attempted to obstruct or impede the administration of justice during the course of the investigation and prosecution of the offense.

(x) The government submits that based on the above calculations, the adjusted offense level is 34.

(E) Late September 2004 Robbery of Ten Kilograms of Cocaine (Federal Robbery)

    (i) Pursuant to USSG § 2B3.1(a), the base offense level is 20.

    (ii) Levels are not added pursuant to USSG § 2B3.1(b)(2), because the presence of dangerous weapons (firearms) is accounted for with the conviction on Count Sixteen, which is a § 924(c) count.

    (iii) Pursuant to USSG § 2B3.1(b)(4)(B), the offense level is increased by 2 levels because a person was physically restrained to facilitate the commission of the offense.

    (iv) Pursuant to USSG § 2B3.1(b)(6), the offense level is increased by 1 because a controlled substance was taken.

    (v) The offense level *should not* be increased by 2 levels pursuant to USSG § 3A1.3, because this enhancement is accounted for under USSG § 2B3.1(b)(4)(B).

    (vi) Pursuant to USSG § 3B1.1(c), the offense level is increased by 2 levels because defendant was an organizer and leader of the criminal activity;

    (vii) Pursuant to USSG § 3B1.3, the offense level should be increased by 2 levels because defendant abused a position of public trust in a manner that significantly facilitated the commission of the offense.

    (viii) Pursuant to USSG § 3B1.5, the offense level should be increased by 2 levels because the offense involved

27

the use of body armor during the commission of a crime of violence.

(ix) Pursuant to USSG § 3C1.1, the offense level is increased 2 levels, because defendant willfully attempted to obstruct or impede the administration of justice during the course of the investigation and prosecution of the offense.

(x) The government submits that based on the above calculations, the adjusted offense level is 31.

(F) 2002 Robbery of $20,000 from A Cocaine Dealer (Federal Robbery)

(i) Pursuant to USSG § 2B3.1(a), the base offense level is 20.

(ii) Pursuant to USSG § 2B3.1(b)(2)(A), the offense level is increased by 5 levels because a firearm was brandished or possessed.

(iii) Pursuant to USSG § 2B3.1(7)(B), the offense level is increased by 1 level because the intended loss was more than $10,000 but not more than $50,000.

(iv) Pursuant to USSG § 3B1.1(c), the offense level is increased by 2 levels because defendant was an organizer and leader of the criminal activity;

(v) Pursuant to USSG § 3B1.3, the offense level should be increased by 2 levels because defendant abused a position of public trust in a manner that significantly facilitated the commission of the offense.

(vi) Pursuant to USSG § 3C1.1, the offense level is increased 2 levels, because defendant willfully attempted to obstruct or impede the administration of justice during the course of the investigation and prosecution of the offense.

(vii) The government submits that based on the above calculations, the adjusted offense level is 32.

(G) Multiple Count Adjustment Under RICO Count: The highest offense level for the racketeering acts is 46, which correlates to narcotics-related racketeering activity, which is all grouped together. That group is assigned one unit pursuant to § 3D1.4(a). An addition ½ units is added pursuant to USSG § 3D1.4(b), because one of the remaining groups (*see* subsection 6(c)(4)(C) has an offense level that is 5 to 8 levels less serious than the group with the highest offense level. Because the total number of units is 1 ½, 1 level is added to the highest group under USSG § 3D1.4.

(H) Accordingly, the government submits that the adjusted offense level for Count One is 47.

(d) Grouping – Multiple Counts: Pursuant to USSG § 3D1.2 (c), Counts One and Two are grouped together in a single group for sentencing purposes because the RICO conspiracy count (Count One) embodies conduct that is treated as a specific offense characteristic in, or other adjustment to, the guideline applicable to the drug conspiracy count (Count Two). Accordingly, the offense level for Count One applies, which is level 47 as set forth above.

(e) Acceptance of Responsibility:

(1) If by the time of sentencing the defendant has clearly demonstrated a recognition and affirmative acceptance of personal responsibility for his criminal conduct within the meaning of USSG § 3E1.1, defendant should receive a 2-level reduction in the offense level. At the present time, given that the defendant may raise factual challenges to the application of certain guidelines, the government reserves its position on this reduction until the time of sentencing.

(2) Defendant notified the government timely of his intention to enter a plea of guilty, thereby permitting the government to avoid preparing for trial and permitting the Court to allocate its resources efficiently, within the meaning of USSG § 3E1.1(b). Accordingly, at the time of defendant's sentencing hearing, the government will move for an additional 1-level reduction if the Court determines that defendant has demonstrated an affirmative acceptance of

29

responsibility within the meaning of USSG § 3E1.1(a) and defendant's offense level is 16 or greater prior to the operation of USSG § 3E1.1(a).

(f)     Count Sixteen:  As a result of defendant's conviction on Count Sixteen, pursuant to 18 U.S.C. § 924 and USSG § 2K2.4(b), the government submits that the Court should impose a sentence of 7 years' (84 months') imprisonment because a firearm was brandished, which sentence must be served consecutive to the sentence imposed on Counts One and Two.  Defendant reserves the right to argue that the firearm was not brandished, and thus, the statutory consecutive minimum sentence should be 5 years (60 months) rather than 7 years.

(g)     Criminal History:  Based upon the information presently known by the government, defendant has no criminal history, and accordingly, his criminal history category is I.

(h)     The government's predicted, preliminary sentencing guideline range on Counts One and Two is life, based upon the calculations set forth above, which include an expected offense level of 47 and criminal history category of I.  As a result of defendant's conviction on Count Sixteen, pursuant to 18 U.S.C. § 924 and USSG § 2K2.4(b), the government submits that the Court should impose a sentence of 84 months' imprisonment, to be served consecutive to the sentences imposed on Counts One and Two.

(i)     The defendant and his attorney and the government acknowledge that the above calculations are preliminary in nature and based on facts known to the government as of the time of this Agreement.  The defendant understands that the Probation Department will conduct its own investigation and that the Court ultimately determines the facts and law relevant to sentencing, and that the Court's determinations govern the final Sentencing Guidelines calculation.  Accordingly, the validity of this Agreement is not contingent upon the probation officer's or the Court's concurrence with the above calculations.

7. Errors in calculations or interpretation of any of the guidelines may be corrected by either party prior to sentencing. The parties may correct these errors or misinterpretations either by stipulation or by a statement to the probation office and/or Court setting forth the disagreement as to the correct guidelines and their application. The validity of this Agreement will not be affected by such corrections, and the defendant shall not have a right to withdraw his plea on the basis of such corrections.

8. Defendant understands that, in imposing the sentence, the Court will be guided by the United States Sentencing Guidelines. The defendant understands that the Guidelines are advisory, not mandatory, but that the Court must consider the Guidelines in determining a reasonable sentence.

9. Defendant understands that Count One, to which he is pleading guilty, carries the following penalties: a maximum penalty of life imprisonment, a maximum fine of $250,000, a term of supervised release of not more than five years, and any restitution ordered by the Court.

Defendant understands that Count Two, to which he is pleading guilty, carries the following penalties: a maximum penalty of life imprisonment, a statutory minimum penalty of 10 years' imprisonment, a maximum fine of $4,000,000, and a term of supervised release of at least five years and up to life, and any restitution ordered by the Court.

Count Sixteen carries a maximum term of imprisonment of life, a maximum fine of $250,000, and a term of supervised release of not more than five years. Defendant further understands that it is the government's position that Count Sixteen carries a statutory minimum term of imprisonment of 7 years, which term must be served consecutive to the sentences imposed on Counts One and Two. Defendant reserves the right to argue that the statutory consecutive minimum sentence is 5 years rather than 7 years.

10. The defendant understands that in accord with federal law, Title 18, United States Code, Section 3013, upon entry of judgment of conviction, the defendant will be assessed $100 on

31

each count to which he has pled guilty, in addition to any other penalty imposed. The defendant agrees to pay the special assessment of $300 at the time of sentencing with a check or money order made payable to the Clerk of the U. S. District Court.

11. Defendant understands that by pleading guilty he surrenders certain rights, including the following:

(a) If defendant persisted in a plea of not guilty to the charges against him, he would have the right to a public and speedy trial. The trial could be either a jury trial or a trial by the judge sitting without a jury. The defendant has a right to a jury trial. However, in order that the trial be conducted by the judge sitting without a jury, the defendant, the government, and the judge all must agree that the trial be conducted by the judge without a jury.

(b) If the trial is a jury trial, the jury would be composed of twelve laypersons selected at random. Defendant and his attorney would have a say in who the jurors would be by removing prospective jurors for cause where actual bias or other disqualification is shown, or without cause by exercising so-called peremptory challenges. The jury would have to agree unanimously before it could return a verdict of either guilty or not guilty. The jury would be instructed that defendant is presumed innocent, and that it could not convict him unless, after hearing all the evidence, it was persuaded of defendant's guilt beyond a reasonable doubt, and that it was to consider each count of the indictment separately.

(c) If the trial is held by the judge without a jury, the judge would find the facts and determine, after hearing all the evidence, and considering each count separately, whether or not the judge was persuaded of defendant's guilt beyond a reasonable doubt.

(d) At a trial, whether by a jury or a judge, the government would be required to present its witnesses and other evidence against defendant. Defendant would be able to confront those government witnesses and his attorney would be able to cross-examine them. In turn,

32

defendant could present witnesses and other evidence in his own behalf. If the witnesses for defendant would not appear voluntarily, he could require their attendance through the subpoena power of the court.

(e)     At a trial, defendant would have a privilege against self-incrimination so that he could decline to testify, and no inference of guilt could be drawn from his refusal to testify. If defendant desired to do so, he could testify in his own behalf.

12.     Defendant understands that by pleading guilty he is waiving all the rights set forth in the prior paragraph. Defendant's attorney has explained those rights to him, and the consequences of his waiver of those rights. Defendant further understands he is waiving all appellate issues that might have been available if he had exercised his right to trial, and may only appeal the validity of this guilty plea or the sentence.

13.     Defendant understands that the indictment and this Plea Agreement are matters of public record and may be disclosed to any party.

14.     Defendant understands that the United States Attorney's Office will fully apprise the District Court and the United States Probation Office of the nature, scope and extent of defendant's conduct regarding the charges against him, and related matters, including all matters in aggravation and mitigation relevant to the issue of sentencing.

15.     At the time of sentencing, each party shall be free to recommend that the Court impose any sentence it deems reasonable and appropriate.

16.     The indictment charges that defendant is liable to the United States for approximately $165,000, which funds are subject to forfeiture pursuant to Title 21, United States Code, Section 853(a)(1) and Title 28, United States Code, Section 2461(c) because they represent property that constitutes or is derived from proceeds traceable to the commission of the offense charged in Count Two. By entry of a guilty plea to Count Two of the indictment, the defendant understands that funds

33

in the amount of $165,000, one 2002 Cadillac Escalade (VIN# 1GYEK63N22R124631), and firearms and ammunition are subject to forfeiture. Defendant agrees to the entry of a forfeiture judgment in the amount of $134,000, the Escalade, and firearms and ammunition because they represent property that was used to facilitate the offense charged in Count Two, or property that constitutes or is derived from proceeds traceable to the commission of the offense charged in Count Two. Prior to sentencing, defendant agrees to the entry of a preliminary order of forfeiture relinquishing any right, title or ownership interest he has in the above funds. Defendant understands that pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c), the government shall be entitled to satisfy the judgment amount with substitute assets. Defendant further understands that forfeiture of this property shall not be treated as satisfaction of any fine, restitution, cost of imprisonment, or any other penalty the Court may impose upon the defendant in addition to the forfeiture judgment.

17. It is understood by the parties that the sentencing judge is neither a party to nor bound by this Agreement and may impose the maximum penalties as set forth in paragraph 9 above. However, the sentencing Court is obligated to consult and take into account the Sentencing Guidelines in imposing a reasonable sentence. The defendant further acknowledges that if the Court does not accept the sentencing recommendation of the parties, the defendant will have no right to withdraw his guilty plea.

18. After sentence has been imposed on Counts One, Two, and Sixteen of the superseding indictment, to which defendant pleads guilty as agreed herein, the government will move to dismiss the remaining counts of the superseding indictment, as well as the original indictment, as to this defendant.

19. At this time, the defendant has indicated he may be willing to cooperate with the government. In the event that the defendant chooses to cooperate and that cooperation is completed

34

prior to the defendant's sentencing, the government agrees to consider whether the cooperation qualifies as "substantial assistance" pursuant to Guideline § 5K1.1 and 18 U.S.C. § 3553(e). If the cooperation is completed subsequent to sentencing, the government agrees to consider whether such cooperation qualifies as "substantial assistance" pursuant to 18 U.S.C. § 3553(e) and Rule 35(b) of the Federal Rules of Criminal Procedure. In either case, the defendant acknowledges that the determination as to whether he has provided "substantial assistance" rests solely with the government. In addition, the defendant acknowledges that should he fail to cooperate truthfully and completely with the government, the government will no longer consider making a motion pursuant to Guideline §5K1.1, 18 U.S.C. § 3553(e), or Fed. R. Crim. P. 35(b). Furthermore, the defendant agrees that, should the government decide to move for a downward departure pursuant to Guideline § 5K1.1, 18 U.S.C. § 3553(e), or Fed. R. Crim. P. 35(b), the defendant will not oppose the government's recommendation to the Court as to the appropriate level of departure. The defendant will not urge the Court to depart based on substantial assistance beyond a level determined appropriate by the government in the government's sole discretion. The government agrees that it will inform the District Court of the full extent of the defendant's cooperation, if any.

20.     Defendant understands that the government has the right to seek defendant's truthful testimony before a grand jury or a district court.

21.     Defendant understands that his compliance with each part of this Plea Agreement extends throughout his sentence, and failure to abide by any term of the Plea Agreement is a violation of the Agreement. He further understands that in the event he violates this Agreement, the government, at its option, may move to vacate the Plea Agreement, rendering it null and void, and thereafter prosecute the defendant not subject to any of the limits set forth in this Agreement, or to resentence the defendant. The defendant understands and agrees that in the event that this Plea Agreement is breached by the defendant, and the Government elects to void the Plea Agreement and

prosecute the defendant, any prosecutions that are not time-barred by the applicable statute of limitations on the date of the signing of this Agreement may be commenced against the defendant in accordance with this paragraph, notwithstanding the expiration of the statute of limitations between the signing of this Agreement and the commencement of such prosecutions.

22.    Defendant and his attorney acknowledge that no threats, promises, or representations have been made, nor agreements reached, other than those set forth in this Agreement, to cause defendant to plead guilty.

23.    Defendant agrees this Plea Agreement shall be filed and become a part of the record in this case.

24.    Should the judge refuse to accept the defendant's plea of guilty, this Agreement shall become null and void and neither party will be bound thereto.

25.    Defendant acknowledges that he has read this Agreement and carefully reviewed each provision with his attorney. Defendant further acknowledges that he understands and voluntarily accepts each and every term and condition of this Agreement.

AGREED THIS DATE:   8/21/06

David Stockman, for PJF

PATRICK J. FITZGERALD
United States Attorney

JOHN LAUSCH
CHRISTOPHER NIEWOEHNER
BRIAN HAYES
Assistant United States Attorney

Broderick C. Jones II

BRODERICK JONES
Defendant

JACK RIMLAND
RICHARD HALPRIN
Attorneys for Defendant

36